**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 24-cr-148 (CJN)** |
| **v.** | : | |
| | : | |
| **JOHN DELBRIDGE, JR., and** | : | |
| **JOHNNY DELBRIDGE III,** | : | |
| | : | |
| **Defendants** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. The defendants, John Delbridge, Jr., and Johnny Delbridge III, have each pleaded guilty to two misdemeanors, a violation of 40 U.S.C. § 5104(e)(2)(D) (disorderly or disruptive conduct on the grounds or in the buildings of the United States Capitol) (Count Three) and a violation of 40 U.S.C. § 5104(e)(2)(G), (parading, demonstrating, or picketing in any Capitol building) (Count Four).

For the reasons set forth herein, the government requests that this Court sentence (1) John Delbridge, Jr., to 30 days of incarceration on Count Three and (2) Johnny Delbridge III to 14 days of incarceration on Count Three. Additionally, the government requests that this Court sentence both defendants to 36 months of probation on Count Four, 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution.

I.     **Introduction**

Defendant John Delbridge, Jr., a 50-year-old owner of a construction business, and his son, Johnny Delbridge III, a 24-year-old construction worker and superintendent, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption

1

of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

Both defendants pleaded guilty to violations of 40 U.S.C. § 5104(e)(2)(D) (disorderly or disruptive conduct on the grounds or in the buildings of the United States Capitol) (Count Three) and 40 U.S.C. § 5104(e)(2)(G), (parading, demonstrating, or picketing in any Capitol building) (Count Four).

For John Delbridge, Jr., the government's recommendation is supported by the defendant's (1) leading his then 20-year-old son to the middle of a violent riot, (2) entry into the Capitol despite seeing clear signs that entry was prohibited, including rioters climbing through windows and a blaring alarm, (3) use of social media before January 6 to anticipate violence, including "civil war," (4) use of social media after January 6 to minimize his conduct, spread misinformation, and blame police officers, (5) lying to the FBI about his conduct by telling agents he did not go inside the Capitol building, and (6) lack of any remorse shown for his conduct.

For Johnny Delbridge III, the government's recommendation is supported by the defendant's (1) entry into the Capitol despite seeing clear signs that entry was prohibited, including rioters climbing through windows and a blaring alarm, (2) bragging about his participation on

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

social media, (3) lying to the FBI about his conduct by telling agents he did not go inside the Capitol building, and (4) lack of any remorse shown for his conduct.

The Court must also consider that the defendants' conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for their actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of the crimes support sentences of 30 days of incarceration for John Delbridge, Jr., and 14 days for Johnny Delbridge III.

## II.    Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* Docs. 35 and 36, Statements of Offense.

*John Delbridge, Jr.'s Social Media Use Before January 6*

In the days after the November 2020 election and before January 6, John Delbridge, Jr., used Facebook to voice his displeasure with the election's outcome. He also anticipated violence because of the results of the election, saying on November 21, 2020, that he expected "war" and "a lot of dead conservatives":

**Author** John Delbridge (Facebook: 100001030972715)
**Sent** 2020-11-21 03:35:07 UTC
**Body** It's already to late if this election is not fixed. We are probably going to war

**Author** John Delbridge (Facebook: 100001030972715)
**Sent** 2020-11-21 03:36:43 UTC
**Body** Then we all have to choose a side. If the dems are in power then there are going to be a lot of dead conservatives

On December 9, 2021, in a public Facebook post, he said, "Civil war is coming!" and "There is no way patriots are going to let this slide!":

| | |
|---|---|
| **Time** | 2020-12-09 02:22:55 UTC |
| **Type** | Comments |
| **Summary** | John Delbridge commented on Ron Sharp's post. `Civil war is coming! There is no way patriots are going to let this slide! The swing states are trying to certify so they don't get caught and that's the only reason for the treason!` |
| **Object Id** | S:_l1416107408639463_1_100001030972715_aToxMDIxODQxOTYxNjg2MjU3MTs=_45_0_RDoxOntzOjIxOiJmZWVkVkYmFja190YXJnZXRfZG9kG9rZW4iO2k6MTAyMTg0MTkyNzA0MTM5MTA7fQ==_1607480575 |

*The Defendants' Role in the January 6, 2021 Attack on the Capitol*

The Delbridges traveled together from their homes in Coeur d'Alene, Idaho, to Washington, D.C., to attend former president Donald Trump's rally at the Ellipse on January 6, 2021. They later walked to the Capitol building and joined the mob of rioters on the West Front of the building. Throughout the day, John Delbridge, Jr., wore a cowboy hat with American flag-style stars and stripes on it that said, "Trump is My President," and Johnny Delbridge III wore a black cowboy hat, black hooded sweatshirt, a green backpack, and gloves. Johnny Delbridge also carried a furled flag with him. *See image 1.*



*Image 1: A screenshot from a Facebook post shows John Delbridge, Jr. (left) and his son, Johnny Delbridge III (right) and the clothes they wore on January 6.*

John Delbridge entered the Capitol building first, walking through the Senate Wing Door at 3:12 p.m. while a blaring alarm sounded. *See image 2.* Johnny Delbridge followed closely behind his father as he entered and continued following him throughout their time in the Capitol.



*Image 2: A screenshot from CCTV shows the Delbridges (circled in yellow) entering the Capitol.*

As they entered, both Delbridges carried cellphones in front of them, using them to record the events unfolding around them. About a minute after he walked into the building, John Delbridge pulled a neck gaiter up from around his neck, covering his face. His son did the same.

After walking through the door, John Delbridge began walking down a connecting hallway. He proceeded a few feet into the hallway, then turned around and returned to the room inside the Senate Wing Door. His son continued to follow him. Having returned to the room inside the Senate Wing Door, the Delbridges paused and stood just a few feet away from multiple police officers wearing riot gear. *See image 3.*



*Image 3: A screenshot from CCTV shows the Delbridges (circled in yellow) in the Capitol, feet away from police officers dressed in riot gear (circled in blue).*

The Delbridges remained in the Capitol building for approximately 3 minutes until they departed through the Senate Wing Door, the same door they entered, at 3:15 p.m.

*John Delbridge, Jr.'s Social Media Use After January 6*

After January 6, John Delbridge, Jr. used Facebook to discuss the events of January 6. He minimized his conduct that day, spread false information by denying that supporters of former President Trump participated in the riot, and blamed police officers.

For instance, on January 9, 2021, John Delbridge, Jr. minimized the conduct of those who participated in the January 6 riot, saying that "capital police" opened doors and that "true Trump supporters obeyed the law":

| | |
|---|---|
| **Time** | 2021-01-09 18:05:32 UTC |
| **Type** | Comments |
| **Summary** | John Delbridge replied to his own comment. `The doors to the capital building were opened up to the protesters by the capital police. I'm not say they should have gone in, but I did see and video a group of about 20 people who were there to cause and incite violence. Did some protesters follow? I'm sure they did. But you have a million plus protesters with less than 70 arrests? And only 54 of those are for curfew! The true Trump supporters obeyed the law and returned to their hotels!` |
| **Object Id** | S:_l1416107408639463_1_100001030972715_aToxMDIyMTMyNTA0NDg5MDUwNDs=_45_0_RDoxOntzOjIxOiJmZWVkYmFja190YXJnZXRfdG9rZW4iO2k6MTAyMjEzMjMwODgwNDE1ODRQ7fQ==_1610215532 |

In a Facebook post on January 12, John Delbridge, Jr. blamed police officers for the events of January 6, saying that "the cops were in on it":

| | |
|---|---|
| **Time** | 2021-01-12 22:45:05 UTC |
| **Type** | Comments |
| **Summary** | John Delbridge replied to his own comment. `There was no security at the capital building you could walk right on up. The cops were in on it. ` |
| **Object Id** | S:_l1416107408639463_1_100001030972715_aToxMDIxODYzODg1MTgyMzMwODs=_45_0_RDoxOntzOjIxOiJmZWVkYmFja190YXJnZXRfdG9rZW4iO2k6MTAyMTg2Mzg3ODg5NDE3MzY7fQ==_1610491505 |

In another post on January 12, he claimed that January 6 was a "complete set up" and "Trump guys" were trying to stop instigators:

**Author** John Delbridge (Facebook: 100001030972715)
**Sent** 2021-01-12 23:15:54 UTC
**Body** I was at the capital building that day, complete set up! There was a group of 25+ guys that were hell bent on getting through those two doors. Trump guys were trying to stop them here and there. Other than that everyone was just peacefully protesting like tourist. Walked right up to the building no baracades or cops. Filmed it all. Anyway Take Care
Your friend
Sweatpants!

*Johnny Delbridge III's Social Media Posts After January 6*

After January 6, Johnny Delbridge III posted a video to Snapchat in which he bragged about his participation in the events of January 6. The video showed crowds of people on Capitol grounds as filmed from his vantage point on the Upper West Terrace. He posted it with the caption, "Took the capital." *See image 4.*



*Image 4: A screenshot of the Snapchat video Johnny Delbridge III posted with the caption, "Took the capital."*

*The Defendants' FBI Interviews*

On May 18, 2021, John Delbridge, Jr., interviewed with FBI agents. During the interview, he said that he traveled to Washington D.C. to attend the former President Trump's speech. He

said he flew there from Spokane, Washington, with his son and stayed from January 3 through January 7.

John Delbridge, Jr., said he attended the former President's rally and walked to the Capitol. He admitted that, once he was on Capitol grounds, he saw multiple signs that people were not allowed to be at the Capitol, including tear gas and pepper spray, and police officers pushing people away from the building.

John Delbridge, Jr., lied to the FBI agents, however, about having gone inside the Capitol building. He told the FBI that he had not gone into the Capitol and said that he chose not to because he did not want to get caught up in the criminal activity he knew was going on.

On May 20, 2021, Johnny Delbridge III also interviewed with FBI agents. Johnny Delbridge III admitted that he went to the Capitol on January 6, but lied to the agents and said that he did not go inside the building. Johnny Delbridge told the agents that his father loaned him the money to make the trip to Washington D.C. and that they attended former-President Trump's speech together as well as several other rally-style events on January 5 and 6.

Johnny Delbridge III said that they walked from the rally to the Capitol, where they saw large crowds on Capitol grounds. He said he saw members of the crowd attempting to enter the building by breaking down doors, scuffling with police, and throwing things at police. Even so, he said he and his father went with the crowd upstairs toward the building. Johnny Delbridge III also admitted that he saw barriers on the ground, as well as flash bangs and officers physically moving people back. He said they stayed in the area for 3 to 4 hours. He falsely denied going inside the building.

When shown the video he posted to Snapchat with the caption "[we] took the capital," Johnny Delbridge III stated that he intended to refer to the collective "we," as in rally attendees, and "took" to mean an overwhelming presence, not a violent mob.

*The Charges and Plea Agreement*

On March 25, 2024, the United States charged both defendants by a four-count Information with violating: 18 U.S.C. § 1752(a)(1) (entering and remaining in a restricted building or grounds) (Count One); 18 U.S.C. § 1752(a)(2) (disorderly and disruptive conduct in a restricted building or grounds) (Count Two); 40 U.S.C. § 5104(e)(2)(D) (disorderly or disruptive conduct on the grounds or in the buildings of the United States Capitol) (Count Three); and 40 U.S.C. § 5104(e)(2)(G), (parading, demonstrating, or picketing in any Capitol building) (Count Four). On June 4, 2024, pursuant to plea agreements, both defendants pleaded guilty to Counts Three and Four. By plea agreement, both defendants agreed to pay $500 in restitution to the Architect of the Capitol.

### III.    Statutory Penalties

Both defendants now face sentencing for violating 40 U.S.C. § 5104(e)(2)(D) and (e)(2)(G). As noted by the plea agreements and the U.S. Probation Office, both defendants face up to six months of imprisonment and a fine of up to $5,000 on each count. Both defendants must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As these offenses are both Class B Misdemeanors, the Sentencing Guidelines do not apply. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the

Section 3553(a) factors weigh in favor of 30 days of incarceration for John Delbridge, Jr., and 14 days of incarceration for Johnny Delbridge III.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing the defendants' participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like these, the absence of violent or destructive acts is not a mitigating factor. Had the defendants engaged in such conduct, they would have faced additional criminal charges.

One of the most important factors in John Delbridge, Jr.'s case is that he led his son to a violent riot. It is clear from the evidence that Johnny Delbridge III followed and emulated his father, following him from Idaho to Washington D.C., following him to the Capitol, and ultimately, following him inside the Capitol building. John Delbridge, Jr.'s son also followed in his father's footsteps by lying to the FBI. John Delbridge, Jr. was dishonest about going into the Capitol when questioned about his actions that day by the agents. Two days later, Johnny Delbridge III did the same thing when he was questioned by the same FBI agents.

John Delbridge, Jr.'s vociferous use of social media is another significant aggravating factor in this case. He used Facebook not only to minimize his own actions, but to spread misinformation about what happened on January 6, and even to blame the police officers who

courageously tried to defend the Capitol. Moreover, to this day, Delbridge, Jr. has not expressed remorse for his actions on January 6.

For Johnny Delbridge III, one of the most important factors is his entry into the Capitol despite admittedly seeing the signs that he should not enter, such as bike-rack barriers, rioters confronting police, and police officers deploying crowd-control munitions. Johnny Delbridge III also lied to the FBI agents when he said that he did not enter the Capitol building. He also has not shown any remorse for his conduct.

Accordingly, the nature and the circumstances of these offenses establish the clear need for sentences of incarceration in this matter.

## B. The Defendants' History and Characteristics

As set forth in the PSR, John Delbridge, Jr.'s criminal history consists of the following convictions, all of which occurred in 1994 or earlier:

- In 1992, John Delbridge, Jr., was charged with two counts of aggravated battery. He received a sentence of 6 months confinement (which appears to have been suspended except for 2 days), two fines of $150, and 2 years of probation. PSR ¶ 33.

- Also in 1992, John Delbridge, Jr., was charged with second degree theft. He received a sentence of 21 days of confinement (partially converted to community service), and 12 months of probation. PSR ¶ 34.

- In 1993, John Delbridge, Jr., was charged with contributing to the delinquency of a minor – alcohol. He was given a $132 fine. PSR ¶ 35.

- In 1994, John Delbridge, Jr., was again charged with contributing to the delinquency of a minor – alcohol. He was given a $153 fine. PSR ¶ 36.

- Also in 1994, John Delbridge, Jr., was charged with underage possession of alcohol. He was given a $149 fine. PSR ¶ 37.

- Also in 1994, John Delbridge, Jr., was charged with underage possession of alcohol and operating after revocation. He was given a $137 fine and a $97 fine. PSR ¶ 38.

- Also in 1994, John Delbridge, Jr., was charged with driving under the influence. He was adjudicated guilty but his sentence is unclear. PSR ¶ 39.

- Also in 1994, John Delbridge, Jr., was again charged with underage possession of alcohol. He was sentenced to 1 year of probation. PSR ¶ 40.

John Delbridge, Jr., also has the following juvenile offenses that occurred in 1992 or earlier: battery, three violations for theft, two violations for assault, and property damage. PSR ¶¶ 26-33.

As set forth in his PSR, Johnny Delbridge III does not have any criminal history, which is not disputed. PSR ¶¶ 26-31.

The defendants' respective criminal histories, and in particular, John Delbridge, Jr.'s previous involvement with the criminal justice system, animates the government's recommendation.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this

defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### General Deterrence

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

### Specific Deterrence

The need for the sentence to provide specific deterrence to these defendants also weighs in favor of a term of incarceration. Although both defendants accepted responsibility by pleading guilty, neither has taken any steps to denounce their words or actions on January 6, 2021, including to the Probation officer who conducted the PSR interviews. The Court should view any remorse the defendants express at sentencing with skepticism at best. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.")

(statement of Judge Chutkan).

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers.[2] This Court must sentence the Delbridges based on their own conduct and relevant characteristics, but should give substantial weight to the context of their unlawful conduct: their participation in the January 6 riot.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

For John Delbridge, Jr.:

In *United States v. Clifford Meteer*, 21-CR-630 (CJN), this Court sentenced the defendant to 60 days of incarceration following his plea one count of violating 40 U.S.C. § 5104(e)(2)(G). Meteer breached the Capitol through the same door that John Delbridge did, and although he remained inside for a longer period of time, he made similar comments after January 6. Meteer made statements on Facebook and in three television interviews after January 6 expressing a lack of remorse, falsely downplaying the violence on January 6 by declaring that there was no riot, and saying that the news coverage was overblown. Meteer also refused, when questioned by the FBI,

---

[2] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

to admit that he went into the Capitol, where Delbridge outright denied that fact. Although Meteer's time in the building was greater than Delbridge's, and Meteer was later found to be in the possession of firearms unlawfully because of a prior conviction, the disparity between his 2-month sentence and the 30-day sentence that is appropriate here would create no unwarranted disparity.

*United States v. Cody Lee Tippett*, 23-CR-337 (CRC) is also an appropriate comparator with the case against John Delbridge, Jr. Following his attendance at the rally, Tippett approached the Capitol from the West side, where he witnessed rioters pushing police and tear gas, as did John Delbridge, Jr., Tippett subsequently followed the mob through the inaugural scaffolding and entered the Capitol through the Senate Wing Door, the same door where the Delbridges entered. While Tippet also moved chairs to help keep the metal gates of the Capitol Visitor Center from closing, John Delbridge's use of social media and lying to the FBI are eqully serious aggravators. Judge Cooper sentenced Tippett to 30 days of incarceration. A thirty-day sentence for Delbridge, Jr. would not create an unwarranted disparity.

<u>For Johnny Delbridge III:</u>

*United States v. Suzanne Ianni*, 21-CR-451 (CJN) presents similarities to that of Johnny Delbridge III. Like Johnny Delbridge III, Ianni saw signs of violence before entering the Capitol—in Ianni's case, she witnessed people who had been injured as they attempted to break into the Capitol, while Johnny Delbridge said he saw scuffles between police and rioters and saw people throwing things at police. While the Delbridges stood near police in riot gear, Ianni was part of a group that confronted police officers. Also like Ianni, Johnny Delbridge III has not expressed remorse for his actions on January 6. This Court sentenced Ianni to 15 days of intermittent

confinement. A similar sentence of 14 days incarceration would not create an unwarranted disparity.

*United States v. Jeremy Grace*, 21-CR-492 (RDM) is another appropriate comparator to the case against Johnny Delbridge III. Grace went to the Capitol on January 6 with his father. Grace grouped himself with Proud Boys on January 6 even after hearing the group was "expecting violence." Like Johnny Delbridge III, Grace saw signs—the deployment of chemical irritants, property damage, and warnings to leave—that he should not enter the Capitol but entered anyway. Grace, like Johnny Delbridge III, lied to the FBI about his conduct after January 6. Grace also shared photos and videos outside and inside the Capitol on social media, as did Johnny Delbridge III. Unlike Johnny Delbridge III, Grace profited from his January 6 participation by selling merchandise. Grace pleaded guilty to violating 18 U.S.C. § 1752(a)(1). Judge Moss sentenced Grace to 21 days of incarceration.

In *United States v. Chance Uptmore,* 21-CR-149 (RCL) is another appropriate comparator for Johnny Delbridge III. Uptmore, like Johnny Delbridge III, came to the Capitol with his father. Also like Johnny Delbridge III, Uptmore saw signs of violence before entering the Capitol, such as rioters fighting with police who had been holding the Northwest Stairs. He also saw tear gas before entering, as did Johnny Delbridge III. The Delbridges and Uptmore both entered through doors while an alarm was blaring. Uptmore's social media postings were more egregious than Johnny Delbridge III's. Where Johnny Delbridge posted the one Snapchat video with the caption, "took the capital," Uptmore posted on his Facebook page that "the violence was minimal" and "The cops were saying stuff like 'we stand with you' and 'thanks for being here.'" Judge Lamberth sentenced Uptmore to 30 days of incarceration.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.     Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[3] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering

---

[3] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that each defendant must pay $500 in restitution, which reflects in part the role they played in the riot on January 6.[4] Plea Agreements at ¶ 11. As the plea agreements reflect, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) The Delbridges' restitution payments must be made to the Clerk of the Court, who will forward the payments to the Architect of the Capitol and other victim entities. *See* PSR ¶ 95.

## VI.    Fine

The defendants' convictions for violations of 40 U.S.C. § 5104 (e)(2)(D) and (G) subject them to statutory maximum fines of $5,000 for Count Three and $5,000 for Count Four. In determining whether to impose a fine, the sentencing court should consider the defendants' income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023).

---

[4] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

For John Delbridge, Jr., the burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994). Here, the defendant has not shown an inability to pay, thus pursuant to the considerations outlined in 18 U.S.C. § 3571, *et. seq.*, the Court has authority to impose a fine.

For Johnny Delbridge III, the defendant's financial assets set forth in the PSR suggest that he is unable, and is unlikely to become able, to pay a fine.

## VII.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence (1) John Delbridge, Jr., to 30 days of incarceration on Count Three and (2) Johnny Delbridge III to 14 days of incarceration on Count Three. Additionally, the government requests that this Court sentence both defendants to 36 months of probation on Count Four, 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on the Delbridges' liberty as a consequence of their behavior, while recognizing their acceptance of responsibility for their crimes.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    /s/ *Eric W. Boylan*
Eric W. Boylan
Assistant U.S. Attorney
Texas Bar No. 24105519

Phone: 202-815-8608
Email: Eric.Boylan@usdoj.gov
601 D Street NW
Washington, D.C. 20001